IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLARENCE YOUNG,<br><br>                Petitioner,<br><br>   v.<br><br>D.K. SISTO,<br><br>                Respondent. | Case No. CIV S-06-1103 VAP (HC)<br><br>**[Petition filed on May 22, 2006]**<br><br>**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS FILED BY A STATE PRISONER** |

## I.   BACKGROUND

Petitioner Clarence Young is a state prisoner. Proceeding in <u>pro se</u>, he filed a habeas corpus action pursuant to 28 U.S.C. § 2254 on May 22, 2006.[1] Respondents filed an Answer on February 13, 2007, and Petitioner filed a Traverse on March 21, 2007.[2]  On

---

[1]  The initial petition named only Robert A. Horel, then Warden of the facility in which Young is incarcerated, as respondent.  The Court's docket incorrectly reflected this case as proceeding against Horel "et al."  In its Answer, the State has requested the Court substitute current warden, D.K. Sisto as Respondent, pursuant to Fed. R. Civ. Pro. 25(d)(1).  The Court hereby GRANTS the request.

[2]  On May 18, 2006, Petitioner was one of thirty-two state prisoners who filed a joint "class action" petition for a writ of habeas corpus, challenging alleged
(continued...)

January 5, 2009, the action was transferred to this Court
pursuant to an Order of Designation of Judge to Serve in
Another District within the Ninth Circuit.

For the reasons stated below, the Court GRANTS the
Petition.

**A.   Statement of Facts**

A jury in the Superior Court of California, County of
Fresno, convicted Petitioner of second degree murder
under California Penal Code section 187. On September 15,
1987, the court sentenced him to a prison term of fifteen
years to life, plus an enhancement of two years for using
a firearm during the offense and an enhancement of five
years for having prior convictions, resulting in a total
term of twenty-two years to life. (Ans. Ex. 1 at 1-2.)
That conviction was affirmed by the California Court of

---

[2] (...continued)
due process violations by the California Board of Prison
Terms ("BPT") (now the "Board of Parole Hearings") in
proceedings during which each petitioner was denied
release on parole. (No. CIV S-06-1083.)  On November 21,
2006, Magistrate Judge Moulds determined that "the claims
at bar arise from individual denials of parole, they are
personal to each petitioner and each petitioner must file
his own individual habeas corpus action," and ordered
each prisoner's claim severed.  The Court thus ordered
the Clerk to open a new action for each prisoner, and for
each petitioner to file an individual habeas petition
within thirty days.  Petitioner failed to do so, and thus
his petition in that matter was dismissed without
prejudice by order of Judge Damrell on April 9, 2007.
(No. CIV S-06-2645, Dkt No. 5.)

Appeal, Fifth Appellate District on September 21, 1989. (Ans. Ex. 3.)

Since his conviction, Petitioner has appeared before the BPT on three occasions.  At the first two hearings, on August 21, 2000 and August 25, 2003, the BPT denied parole, and set a further hearing dates.  (Pet. Ex. B, Ex. C.)  At the first two hearings, the BPT made several recommendations to Petitioner, including that he attend Alcoholics Anonymous ("AA") meetings, maintain a clean disciplinary record, finish his vocational training and obtain employment offers.  (Pet. Ex. B at 4:12-7:15, Ex. C at 3:5-7:16.)  The allegations in this petition concern the BPT's denial of parole after the third hearing on December 6, 2004 ("the hearing").  The Court summarizes the record before the BPT at that time below.

### 1.   The Underlying Crime and Petitioner's Acceptance of Responsibility

Fresno police officers responded to a call from an apartment complex at about 4:49 p.m. on July 31, 1986, where there had been a "serious disturbance . . . between white and black men armed with guns and baseball bats." (Ans. Ex. 4 ("Hearing Trans.") at 10:7-18.)  A crowd had formed around a Dodge two-door coupe.  The officers found a woman in the car, holding Vernon Witcher ("the victim") in her lap, who was unconscious and bleeding in the face.

1   (<u>Id.</u> at 10:21-11:3.)  Witcher was transported to a local

2   hospital, where he later died as a result of a gunshot to

3   the head.  (<u>Id.</u> at 11:6-10.)

4

5      An investigation of the incident revealed that it was

6   the culmination of a day-long series of confrontations

7   "between a group of white and black persons who had been

8   drinking," in which Petitioner, a black man, had stood

9   one step back from the victim, a white man, and fired one

10   shot directly into his face.  (Hearing Trans. at 11:14-

11   23.)

12

13      At trial, Petitioner maintained that it was his

14   friend Ronnie Louis ("Louis"), and not him, who shot the

15   victim - an assertion he has maintained throughout his

16   imprisonment.  (Hearing Trans. at 12:7-13, 13:1-4; 44:7-

17   45:15.)  Although Louis initially denied to police that

18   he shot the victim, Louis later testified that, during

19   the encounter, he pointed a gun at the victim and the gun

20   discharged accidentally.  (Ans. Ex. 3 at 14, 16.)

21   Several trial witnesses also testified that Louis was the

22   actual shooter.  (Ans. Ex. 3 at 14, 16.)  In affirming

23   his conviction, though, the state Court of Appeal noted

24   testimony from several other witnesses who identified

25   Petitioner as the shooter.  (<u>Id.</u> at 7, 9-10, 12-13.)  In

26   addition, a July 1987 Probation Report indicated that

27   witnesses had identified Petitioner as the shooter in a

28

photograph line-up.  (Ans. Ex. 2 at 5; Hearing Trans. at 43:16-23.)

Despite his assertions that he was not the actual shooter, Petitioner acknowledged that he was "responsible" for the death of the victim in the sense that he had been the one arguing with the victim, and "had [he] dealt with it some kind of way different, that it probably wouldn't of [sic] got to the point that it got. . . ."  (Hearing Trans. at 12:14-27, 14:23-26.)  He admitted he borrowed a gun on the night in question, because "it looked like it was going to get serious." (Id. at 13:13-16.)

At the hearing, Petitioner was asked his thoughts on the impact of the victim's death on the victim's family and he responded that he thought it had a "tremendous impact."  (Hearing Trans. at 15:22-25.)  He stated he had read the letters submitted by the victim's family, and understood their anger.  (Id. at 15:26-16:2.)  Petitioner was also asked what, over the course of his incarceration, he had learned that might prevent him from "repeating a situation like this."  (Id. at 16:16-19.) He explained that he realized he had "to watch who [he] associate[d] [him]self with," and that his education and job training while in prison would help him "live a

productive life" and "not hang around all those negative"

influences.  (Id. at 16:20-17:4.)  He stated:

> I've learned that in order to live a successful
> life out there I have to have a job, I have to
> do the things that don't lead you down the road
> of crime and things of that nature.  And that's
> what I've been doing all the time that I've been
> locked up.  I've been working on change,
> changing myself to be a better person.

(Id. at 47:7-13.)

### 2.   Petitioner's Prior Criminal History

In 1980, Petitioner was arrested for and pled guilty

to theft of a moped.  (Hearing Trans. at 17:19-27.)  He

received 90 days of jail time and three years probation

for this offense.

In 1981, Petitioner was arrested and convicted for

his involvement in an armed robbery.  (Hearing Trans. at

18:15-17.)  Petitioner was sentenced to three years'

imprisonment, and served 241 days before being released

on probation.  (Id. 18:18-19:5.)  At the hearing,

Petitioner admitted that he was involved with the robbery

and was armed on the day in question, although Petitioner

did not brandish the gun and no one was injured in the

robbery.  (Ans. Ex. 2 at 10-11.)

At some time after his 1981 conviction, Petitioner

was arrested for assault with a deadly weapon under Penal

Code section 245 arising out of an altercation in an

adult bookstore, where he brandished a buck knife.

6

1   (Hearing Trans. at 20:6-25.)   Petitioner pled guilty to a

2   reduced charge of drawing, exhibiting, or using a deadly

3   weapon under Penal Code section 417.   (Id. at 20:6-10.)

4

5       In 1986, Petitioner pled guilty to a charge of giving

6   false identification to a peace officer, and was

7   sentenced to probation.   (Hearing Trans. at 21:2-6.)   At

8   the hearing, Petitioner explained that he "had no

9   business driving the vehicle" and did not have his

10  identification on him at the time, so gave his brother's

11  name.   (Id. at 21:7-22.)

12

13      At the hearing, BPT Presiding Commissioner Daly also

14  asked Petitioner about several vehicle code violations,

15  along with failures to appear in response to traffic

16  tickets.   Petitioner had little recollection of these

17  violations.   (Hearing Trans. at 21:23-23:2.)

18

19      Petitioner also admitted to having violated the

20  Health and Safety Code by selling methamphetamine to an

21  undercover officer prior to his commitment offense.

22  (Hearing Trans. at 23:3-10.)   He denied ever using

23  methamphetamine, or any other drugs besides occasional

24  marijuana use.   (Id. at 23:10-24:24.)

25

26

27

28

7

### 3.   Petitioner's Social History

At the hearing, BPT Presiding Commissioner Daly explored Petitioner's social history, noting that his parents separated when he was around age 14, and that he attended school until the last semester of twelfth grade. (Hearing Trans. at 25:10-14.)   Petitioner indicated he was married to his wife, Rhonda, but they were "not as close right now" and that "[t]hings are not going too good."   (Id. at 25:25-27.)   He had not had a visit from her in several years.   (Id. at 26:1-4.)   Petitioner has three children with Rhonda Young, and five other children from prior relationships.   (Id. at 25:17-19, 40:16-41:18.)   He maintains contact with all of them except one child in Alabama.   (Id. at 41:19-26.)   He noted that his ex-wife, brothers, and sisters all sent him money, and support him "a hundred percent."   (Id. at 27:2-4.)

### 4.   Petitioner's Prison Record

In his seventeen years in prison beforethe December 2004 hearing, Petitioner had only been reported for one serious instance of misconduct (a "CDC 115"), for a fight in 1996, a record that BPT Deputy Commissioner Smith noted was "excellent."   (Hearing Trans. at 27:25-28:1.) Petitioner had been cited for nine minor instances of misconduct ("CDC 128As"), with the most recent in July 2000 for "tenting [his] bunk area."   (Id. at 28:1-3.)

8

While incarcerated, Petitioner completed his general equivalency diploma ("GED"), as well as programs in stress management, parenting, anti-violence, anger management, and youth-adult awareness. (Hearing Trans. at 28:3-5, 32:23-27.)  Petitioner also participated in numerous vocational training programs, although he only completed one (in electronics). (Id. at 28:18-26; 38:7-39:3.)  Petitioner's failure to finish at least some of the vocational programs was apparently due to prison transfers, rather than any problems on Petitioner's part. (Pet. Ex. B at 48:18-22, Ex. C at 61:5-17.)  At the time of the hearing, he was working as a clerk in the prison's music program and receiving average work reports, was doing volunteer work in the law library, and was enrolled in a community college history course. (Id. at 28:5-17, 29:18-30:1, 31:8-32:7.)  Petitioner had also been attending Alcoholics Anonymous ("AA") meetings for approximately one year in response to BPT Presiding Commissioner Daly's suggestion at his 2003 hearing. (Id. at 29:9-17; 39:18-40:9.)

### 5.  Petitioner's Psychological Evaluation

In a report dated July 20, 2004, a psychologist or psychiatrist named Dr. Rouse concluded that Petitioner had "made the most appropriate personal, social, and behavioral adjustments in this institutional setting," presented "a low risk of danger to the community," and

that Petitioner had no mental illness or health
conditions relevant to a parole determination.  (Hearing
Trans. at 32:13-33:12.)


**6.   Petitioner's Plans for Parole and Indicia of
      Support**

If released on parole, Petitioner stated he planned
to live with his mother in Fresno.  (Hearing Trans. at
33:13-18.)  Petitioner produced letters from two
potential employers, who both wrote they would and could
provide him with employment.  (Id. at 33:19-35:1.)


Petitioner also provided multiple letters of support
from friends and family members.  BPT Deputy Commissioner
Smith noted that these included "very positive" letters
from Petitioner's aunt, cousin, sister and a long-time
family friend (Hearing Trans. at 35:1-36:7, 36:10-12, 17-
24); a letter from another sister stating she supports
parole and would offer Petitioner a place to live in
Fresno (Id. at 36:10-14); a letter from Petitioner's
defense attorney (Id. at 36:21-22); a letter from
Petitioner's mother, who confirmed that Petitioner could
live with her and she supported his parole plan (Id. at
36:25-26); a "very supportive" letter from Petitioner's
father (Id. at 36:26-27); and a letter from the mother of
one of Petitioner's daughters.  (Id. at 37:1-9.)

### 7.   Submissions Opposing Parole

The BPT also received three submissions opposing parole.  The District Attorney's office for Fresno County, which had prosecuted the underlying offense, submitted a letter opposing a grant of parole.  (Hearing Trans. at 37:16-20.)  Also, the mother and brother of the victim of the underlying offense submitted letters indicating they were "strongly opposed" to parole.  (<u>Id.</u> at 37:20-26.)

The Court has reviewed the letters submitted by the victim's family.  Both letters include racial epithets and insults, and express a clear desire for retribution. The letters suggest Petitioner should never be released from prison or should be executed.  (Pet. Exs. D-E.)

### 8.  The BPT's Denial and Reasoning

The BPT concluded that Petitioner was "not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."  (Hearing Trans. at 52:10-13.)

In explaining its decision, the BPT focused primarily on the nature of the underlying offense.  Speaking for the BPT, Presiding Commissioner Daly explained:

> The offense was carried out in an extremely
> callous and actually very reckless manner.
> Multiple victims were present when they -- one
> individual was killed as a result of a gunshot

1  wound to the face.  And the offense was carried
   out in a manner that showed a total disregard
2  for the human suffering of what was going -- and
   that after the victim was shot everybody ran.
3  Nobody sought to give aid.  And the motive for
   the crime was most trivial in relation to the
4  offense in that this offense started out as an
   altercation between two groups and it escalated
5  into the victim being shot in the face.

6  (Hearing Trans. at 52:14 - 53:1.)

7

8       The BPT acknowledged that some witnesses testified

9  that the Petitioner was the actual shooter, and that

10 other witnesses testified that he was not, but quoted the

11 portion of the state Court of Appeals' decision that

12 explained this was an issue considered by the jury.

13 (Hearing Trans. at 53:1-54:6.)

14

15      In addition to the underlying offense, the BPT panel

16 noted Petitioner's prior criminal history (Hearing Trans.

17 at 54:6-12, 22-26), his prior use of alcohol and

18 marijuana, (Id. at 54:20-21), and that he had "failed to

19 profit from society's previous attempts to correct his

20 criminality, and that included adult probation."  (Id. at

21 54:18-20.)  The BPT panel also cited the opposition

22 letters submitted by the Fresno County District Attorney

23 and the victims' family members.  (Id. at 55:16-22).  The

24 panel also concluded that Petitioner had a "history of

25 unstable relationships with others in that he has

26 fathered eight children without the benefit of marriage

27 and without the benefit of thinking about his

28

responsibilities to these children at the time."[3]   (Id.
at 54:6-17.)

The BPT did note several factors weighing in favor of
a positive suitability determination, including his good
disciplinary record, participation in self-help programs,
his psychiatric reports, and "sufficient" parole plans.
(Hearing Trans. at 55:2-16.)  Reviewing Petitioner's
significant work and education record while in prison,
Presiding Commissioner Daly noted: "The Panel finds that
the prisoner should be commended."  (Id. at 55:22-56:16.)

The Panel found, though, that "these positive aspects
of his behavior do not outweigh his factors of
unsuitability," and denied parole for another year.
(Hearing Trans. at 56:20-23.)  The Panel instructed
Petitioner to "remain disciplinary-free," "continue
trying to get a second vocation and continue to
participate in self-help" programs and AA.  (Id. at
56:23-57:2.)  Presiding Commissioner Daly also expressed
"concern" that Petitioner's work reports were only
"average,"  "it's not bad, but we do see a lot better
reports."  (Id. at 57:2-6.)

---

[3] This statement was inaccurate. Petitioner was
formerly married to the mother of three of these
children, and is currently married to the mother of three
of his other children.  (Hearing Trans. at 40:16-26.)

**B.   Procedural History**

Petitioner challenged the BPT's denial of parole by filing a petition for writ of habeas corpus in the California Superior Court, County of Fresno, on February 22, 2005.  (Ans. Ex. 6.)  The Superior Court summarily denied the petition on March 14, 2005, noting only that it found "that sufficient evidence exists to support the parole decision made in this case."  (Id. at 1.)

Petitioner then filed a subsequent petition for writ of habeas corpus in the California Supreme Court on April 19, 2005.  (Cal. Supreme Court Case No. S133156.)  That petition was denied on March 22, 2006, with the notation "See In re Rosenkrantz (2002) 29 Cal. 4th 616, 653-654, 658, 682-686; In re Dannenberg (2005) 34 Cal. 4th 1061, 1084, 1087."  (Id.)  Petitioner filed a second petition on July 29, 2005, which was also denied on March 22, 2006, with a notation "See In re Dannenberg (2005) 34 Cal. 4th 1061, 1097."  (Cal. Supreme Court Case No. S135968.)

**C.   Petitioner's Claims**

Petitioner filed this petition on May 22, 2006, and asserts the following grounds for federal habeas corpus relief:

14

1        1.   The BPT violated Petitioner's state and federal

2   constitutional rights to due process by denying him

3   parole without "some evidence" to support its decision;

4        2.   The BPT was obligated under Cal. Penal Code §§

5   3041 and 1170.2 to set his term when he reached his

6   minimum parole date, but failed to do so, in violation of

7   his state and federal constitutional rights; and

8        3.   The BPT violated Petitioner's rights under the

9   Fifth and Fourteenth Amendments to the United States

10  Constitution by allowing his victim's next of kin to

11  submit "opposition letters containing bigotry and

12  allegations of other crimes."

13

14              **II.   LEGAL STANDARD**

15       The Antiterrorism and Effective Death Penalty Act of

16  1996 ("AEDPA") governs the Court's review of this

17  Petition, as the petition was filed after AEDPA's

18  effective date.   Under 28 U.S.C. § 2254(a), "a district

19  court shall entertain an application for a writ of habeas

20  corpus in behalf of a person in custody pursuant to the

21  judgment of a State court only on the ground that he is

22  in custody in violation of the Constitution or laws or

23  treaties of the United States."

24

25       When considering a properly exhausted claim under

26  AEDPA, a federal court must defer to a state court's

27  holding unless it "'was contrary to, or involved an

28

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or if the state court decision 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Smith v. Curry, 580 F.3d 1071, 1079 (9th Cir. 2009), quoting 28 U.S.C. §§ 2254(d)(1)-(2).   When a state court does not explain its reasoning, a federal court "must conduct an independent review of the record to determine whether the state court's decision was objectively unreasonable." Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1127 (9th Cir. 2006) (citing Lewis v. Mayle, 391 F.3d 989, 996 (9th Cir. 2004)).

    "Clearly established Federal law" is defined as "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Curry, quoting Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).   "[I]t is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." Knowles v. Mirzayance, --- U.S. ---, 129 S. Ct. 1411, 1419 (2009).   However, "the Supreme Court need not have addressed an identical fact pattern to qualify as clearly established law, as 'even a general standard may be applied in an unreasonable manner.'"   Jones v. Ryan,

583 F.3d 626, 635 (9th Cir. 2009), quoting Panetti v. Quarterman, 551 U.S. 930, 953 (2007).

### III.   DISCUSSION

As a preliminary matter, under 28 U.S.C. § 2254(a), a federal court may only entertain a habeas petition on the ground that a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States."  Therefore, insofar as they allege deprivations of his rights under the California Constitution, Petitioner's claims are not cognizable on federal habeas review.  See Sperling v. Clay, No. EDCV 08-944-ODW (RNB), 2009 WL 62433, at *5 n.4 (C.D. Cal. Jan. 9, 2009) (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)). Similarly, the Court only examines Petitioner's allegations that the BPT violated Cal. Penal Code §§ 1170.2 and 3041 insofar as this conduct violated Petitioner's federal constitutional rights.

**A.   Petitioner's First Claim**

Petitioner's first claim is that the BPT's denial of parole was not supported by "some evidence," and thus deprived him of his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution.

### 1)   The Due Process Standard of Review

The Fifth and Fourteenth Amendments prohibit the government from depriving a person of life, liberty, or property without due process of law.  In determining whether the government has violated a prisoner's due process rights, courts are to conduct a two-step analysis.  Kentucky Dep't of Corrs. v. Thompson, 490 U.S. 454, 460 (1989).  The first step asks whether the challenged action implicates a constitutionally protected liberty or property interest.  Id.  If so, then the court is to examine "whether the procedures attendant upon that deprivation were constitutionally sufficient."  Id.

Under well-established Supreme Court precedent, although "the presence of a parole system by itself does not give rise to a constitutionally protected liberty interest in parole release," a prisoner has a protected liberty interest in parole when the relevant statute or regulations require release if a parole board "determines (in its broad discretion) that the necessary prerequisites exist."  Board of Pardons v. Allen, 482 U.S. 369, 373, 376 (1987).  See also Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1, 11-12 (1979).

California's parole scheme has been held to vest California prisoners with such a protected interest, based on language in Penal Code section 3041 that states

18

that the parole board "*shall* normally set a parole release date." <u>Irons v. Carey</u>, 505 F.3d 846, 850 (9th Cir. 2007); <u>Sass v. California Bd. of Prison Terms</u>, 461 F.3d 1123, 1127 (9th Cir. 2006); <u>Biggs v. Terhune</u>, 334 F.3d 910, 914-15 (9th Cir. 2003); <u>McQuillion v. Duncan</u>, 306 F.3d 895, 902-03 (9th Cir. 2002).

In <u>Hayward v. Marshall</u>, No. 06-55392 (9th Cir. Apr. 22, 2010) (en banc), the Ninth Circuit, sitting en banc, overruled these cases insofar as they "might be read to imply that there is a federal constitutional right *regardless of whether state law entitles the prisoner to release*." Slip Op. at 18. The court did not expressly state, though, whether it was overruling the holding of these cases that California's particular parole scheme establishes such a protected liberty interest under federal due process. But since the <u>Hayward</u> majority concluded that, on habeas review, federal courts are to examine whether California state courts reasonably applied California's "some evidence" standard, there must be a federal due process right at issue. If there were not, there would be no basis for federal habeas review. <u>See</u> <u>Cooper v. Brown</u>, 510 F.3d 870, 1001 (9th Cir. 2007) (citing <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991) and noting "the well-established rule that federal habeas corpus relief does not lie for errors of state law, and that it is not the policy of the federal courts to re-examine state court determinations of state law

questions.")   See also Hayward, concurring slip op. at 13
(Berzon, J., (concurring in part and dissenting in part)
(explaining that application of California "some
evidence" standard is an issue of federal due process)).

In determining whether a prisoner has been deprived
of this liberty interest by a denial of parole, though,
this Court's inquiry is extremely limited.  California
law requires that a denial of parole be supported by
"some evidence in the record," "based upon the factors
specified by statute and regulation."  In re Rosenkrantz,
29 Cal. 4th 616, 659 (2002).  In Hayward, the en banc
Ninth Circuit held that a federal habeas court's sole
inquiry in analyzing a due process challenge is whether
the California court's application of this standard was
"unreasonable" or "based on an unreasonable determination
of the facts in light of the evidence."  Slip Op. at 37.

The factors which may support a determination that a
life prisoner convicted of murder is unsuitable for
parole are set forth in Cal. Admin. Code tit. 15, § 2402.
Factors weighing against a grant of parole are certain
characteristics of the commitment offense,[4] a previous

---

[4] Penal Code § 3041 also mandates that the board
consider certain aspects of the underlying crime,
including the number of victims of the crime, "the
gravity of the current convicted offense or offenses, or
the timing and gravity of current or past convicted
offense or offenses," and "other factors in mitigation or
(continued...)

record of violence, an unstable social history, a history
of sadistic sexual offenses, a history of "severe mental
problems related to the offense," and "serious
misconduct" while imprisoned.  Cal. Admin. Code tit. 15,
§ 2402(c).

Factors weighing in favor of parole include the lack
of a juvenile record, a stable social history, signs of
remorse or understanding of the significance of the
crime, whether the crime was committed as the result of
"significant stress" in the prisoner's life or while the
prisoner suffered from Battered Woman Syndrome, a lack of
significant history of violent crime, advanced age,
"understanding and plans for future," and participation
in institutional activities while incarcerated.  Cal.
Admin. Code tit. 15, § 2402(d).  Regardless of time
served, a life prisoner is to be deemed "unsuitable for
and denied parole if in the judgment of the panel the
prisoner will pose an unreasonable risk of danger to
society if released from prison."   Cal. Admin Code tit.
15, § 2402(a).

In reaching its determination, the BPT is to consider
"[a]ll relevant, reliable information available,"
including:

---

[4](...continued)
aggravation of the crime."  Penal Code §§ 3041(a)-(b).

the circumstances of the prisoner's social
history; past and present mental state; past
criminal history, including involvement in other
criminal misconduct which is reliably
documented; the base and other commitment
offenses, including behavior before, during and
after the crime; past and present attitude
toward the crime; any conditions of treatment or
control, including the use of special conditions
under which the prisoner may safely be released
to the community.

Cal. Admin. Code tit. 15, § 2402(b).

### 2)   Analysis of the Record

Since neither the California Superior Court nor the
California Supreme Court explained its reasoning, the
Court conducts an independent review of the record in
order to determine whether the state courts' conclusions
that some evidence supported the BPT's decision was
objectively reasonable based on the record before it.
Sass, 461 F.3d at 1127.

Under the California "some evidence" standard, "the
relevant inquiry is whether some evidence supports the
decision of the Board or the Governor that the inmate
constitutes a current threat to public safety, and not
merely whether some evidence confirms the existence of
certain factual findings."   In re Lawrence, 44 Cal. 4th
1181, 1212 (2008).

The BPT's decision here was primarily based upon
Petitioner's pre-incarceration history:  the nature of
the underlying offense, his pre-incarceration substance

abuse, his having fathered children out of wedlock, and his criminal record prior to entering prison.  Under California law, pre-incarceration history may provide "some evidence" for a denial of parole *only if*, "when considered in light of other facts in the record, [they] are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude."  <u>Lawrence</u>, 44 Cal. 4th at 1221 (2008).[5]  <u>See also</u> <u>Hayward</u>, slip op. at 36.

Here, there were no facts before the BPT that the state court could have reasonably interpreted as indicating that Petitioner's pre-incarceration history remained predictive of Petitioner's dangerousness at the time of his hearing.  <u>Compare</u> <u>Hayward</u>, slip op. (majority) at 37, concurring op. (Berzon, J.) at 16 (noting negative psychological reports).[6]  Petitioner had a positive psychological evaluation, an "excellent"

---

[5] The same standard also applies to the consideration of other aspects of pre-incarceration criminal history. <u>See</u> <u>Lawrence</u>, 44 Cal. 4th at 1214.

[6] <u>In re Lawrence</u> was decided after the California courts reviewed Petitioner's case, but provides the standard by which this Court must analyze this Petition under <u>Hayward</u>.

disciplinary record, a record of pro-social activities while incarcerated, and "sufficient" post-parole plans, including a place of employment and a place to live. There is no evidence that Petitioner has used drugs or alcohol during his time in prison.  This record in no way shows that Petitioner's pre-incarceration conduct, twenty-four years ago, "continue[s] to be predictive of current dangerousness," as California law requires.  Slip Op. at 37.

The only evidence beyond pre-incarceration factors that Respondent cites to as support of the BPT's decision are the submissions of the District Attorney and victims' family members as some evidence in support of the BPT's decision.  (Ans. at 3.)  Under California law, the BPT is required to consider "all pertinent information and input about the particular case from the inmate's victims, the officials familiar with his or her criminal background, and other members of the public who have an interest in the grant or denial of parole to this prisoner."  In re Dannenberg, 34 Cal. 4th 1061, 1086 (2005).  The District Attorney's opposition was based solely on the nature of the offense, and is thus insufficient, for the reasons explained above, to constitute some evidence in support of an unsuitability determination.  The submissions of the victim's family provide no reason for the denial of parole other than the nature of the underlying crime, accounted for above; unsupported, speculative, and

hearsay character attacks on Petitioner; and racist invective.  To give weight to such letters would run counter to well-settled Supreme Court precedent: "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." Palmore v. Sidoti, 466 U.S. 429, 433 (1984).

There was no evidence on the record before the Board which reflected "that the inmate constitutes a *current* threat to public safety" under California law.  Thus, the contrary determination was an unreasonable application of California's "some evidence" standard, and thus a denial of due process.  See Hayward, slip op. at 37. Petitioner is thus entitled to habeas relief on his first claim.

**B.  Petitioner's Second Claim**

Petitioner's second claim appears to be that the BPT improperly applied California Penal Code sections 1170.2 and 3041 in denying him parole, in that those provisions require prison terms to be fixed at a number of years proportionate to individual culpability.  (Pet. at 13.) He argues the BPT is refusing to enforce those statutes as written.  (Id. at 14.)  Since no state court provided any reasoning with respect to its denial of this claim, the Court "independently review[s] the record on this issue to determine whether the state court clearly erred in its application of controlling federal law and whether

its decision was "objectively reasonable."  <u>Delgado v.</u>
<u>Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000).


     As noted above, the Court does not consider
Petitioner's claims that the BPT's actions violate
California statute or the California Constitution.  The
Court notes, though, that, under California law, the BPT
"does not have a 'mandatory duty to set a release date
for all indeterminate life inmates, or any particular
such prisoner,' because 'an inmate must be found suitable
before a release date is set. . . .'"  <u>Karr v. Sisto</u>, No.
2:07-cv-00510-RSL-JLW, 2010 WL 1135873, at *12 (E.D. Cal.
Mar. 22, 2010), <u>quoting</u> <u>In re Dannenberg</u>, 34 Cal. 4th
1087-88 (2005).


     In addition to his argument that the BPT violated
California law, Petitioner also contends that the BPT
violated numerous provisions of the United States
Constitution in denying him parole.  These include the
provisions in Article I, Sections 9 and 10 that prohibit
bills of attainder or ex post facto laws; the Eighth
Amendment's ban on cruel and unusual punishment; and the
Equal Protection Clause of the Fourteenth Amendment.
The Court concludes none of these allegations state a
cognizable constitutional claim.


     Petitioner argues that the BPT's denial of parole was
a bill of attainder.  Since Petitioner was sentenced to a

total term of twenty-two years to life, with the
possibility, not the guarantee of parole, "the denial of
parole does not impose an additional or more onerous
punishment for his commitment offense" and "is not a
punishment in addition to that which he faced when he was
convicted in judicial proceedings." Woo v. Powers, No.
EDCV 05-375-SJO (JC), 2008 WL 4361246, at *11 n.12 (C.D.
Cal. Sept. 15, 2008), citing Guzman v. Morris, 644 F.2d
1295, 1299 (9th Cir. 1981).  As such, the denial of
parole cannot constitute a bill of attainder.  Id.

    Petitioner contends that the Board's denial of parole
violates the prohibition on ex post facto laws.  Inasmuch
as this is a challenge to the enactment of California
Penal Code sections 1168, 1170, and 1170.2, Petitioner
does not identify any provision of these statutes that
was enacted after his conviction, and thus has no ex post
facto claims.  See United States v. George, 579 F.3d 962,
968 (9th Cir. 2009).  See also California Dep't of
Corrections v. Morales, 514 U.S. 499 (1995).  Inasmuch as
Petitioner is challenging the Board's denial of parole
more generally, this claim fails for the same reason as
his bill of attainder claim.  "While petitioner might
have had a subjective expectation that he would be
released from prison sooner, the Board's decision to deny
him a parole release date because he presents an
unreasonable risk of danger to society has not enhanced
or otherwise 'converted' petitioner's punishment." Karr,

2010 WL 1135873 at *14.  <u>See also</u> <u>Gilman v. Davis</u>, No.
CIV. S-05-830 LKK, 2010 WL 434215 at *3-*4 (E.D. Cal.
Feb. 4, 2010), <u>citing</u> <u>Garner v. Jones</u>, 529 U.S. 244, 250
(2000).

     Although Petitioner invokes the Equal Protection
Clause of the Fourteenth Amendment, he does not identify
any way in which he was treated differently from
similarly situated prisoners, and thus fails to state a
cognizable equal protection claim.  <u>See, e.g.</u>, <u>Caswell v.
Calderon</u>, 363 F.3d 832, 837-38 (9th Cir. 2004); <u>Lam v.
Hartley</u>, No. 1:08-CV-01747 LJO JMD HC, 2010 WL 1286799,
at *5 (E.D. Cal. Mar. 29, 2010).

     Finally, Petitioner fails to state a claim for cruel
and unusual punishment.  A sentence of imprisonment may
be "cruel and unusual" under the Eighth Amendment if it
is "extreme" or "grossly disproportionate." <u>Plascencia
v. Alameida</u>, 467 F.3d 1190, 1204 (9th Cir. 2006), <u>citing</u>
<u>Harmelin v. Michigan</u>, 501 U.S. 957, 996-97 (1991).  "In a
particular case, if no term has been explicitly set by
the Board because the prisoner has not yet been found
suitable for parole, the prisoner's term is presumed to
be the statutory maximum of his sentence for the purposes
of cruel and unusual punishment analysis." <u>Karr</u>, 2010 WL
1135873 at *12, <u>citing</u> <u>People v. Wingo</u>, 14 Cal. 3d 169,
184 (1975); <u>In re Rodriguez</u>, 14 Cal. 3d 639, 654 n. 18
(1975).  The maximum for Petitioner's sentence was life

imprisonment, and a life sentence for second-degree murder is not so disproportionate as to constitute cruel and unusual punishment under the Eighth Amendment.  <u>See,</u> <u>e.g.</u>, <u>Windham v. Merkle</u>, 163 F.3d 1092, 1106-07 (9th Cir. 1998); <u>Rhodes v. Kirkland</u>, No. C 06-5252 JF, 2010 WL 291781, at *5 (N.D. Cal. Jan. 19, 2010); <u>Svelund v.</u> <u>Sisto</u>, No. 2:06-CV-00500-RSLJLW, 2010 WL 234861, at *13 (E.D. Cal. Jan. 14, 2010).

## C.   Petitioner's Third Claim

Petitioner's third claim is that the BPT violated his due process rights by considering the opposition letters submitted by the family of his victim.  This claim has been encompassed in the Court's discussion of Petitioner's First Claim.  The fact that these letters were submitted and considered by the Board would not give rise to an independent due process claim had "some evidence" beyond the racially prejudicial letters supported the Board's decision.

## IV.   CONCLUSION

For the reasons stated above, the Court GRANTS the Petition for a Writ of Habeas Corpus.  The Board shall find Petitioner suitable for parole at a hearing to be held within 30 days of the finality of this decision, unless new evidence of his conduct in prison or change in mental status subsequent to the December 6, 2004 parole consideration hearing is introduced that is sufficient to

support a finding that Petitioner currently poses an
unreasonable risk of danger to society if released on
parole; and in the absence of any such new evidence
showing Petitioner's unsuitability for parole, the Board
shall calculate a prison term and release date for
Petitioner in accordance with California law.  Further,
if the release date already has lapsed, Respondent shall,
within 10 days of the Board's hearing, either release
Petitioner forthwith if his release date lapsed more than
three years earlier, or release Petitioner on parole for
that period of his three year parole term that remains if
the release date lapsed less than three years earlier.

**IT IS SO ORDERED.**

Dated: <u>July 20, 2010</u>

                      **VIRGINIA A. PHILLIPS**
           **United States District Judge**